```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```

JESSIE J. COOPER,

       Petitioner,

-vs-    **No. 10-CV-6467(MAT)**
       **DECISION AND ORDER**

HAROLD D. GRAHAM,

       Respondent.

## I. Introduction

Jessie J. Cooper ("Cooper" or "Petitioner") has filed a pro se habeas corpus petition pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody in violation of his federal constitutional rights. Petitioner is incarcerated pursuant to a judgment of conviction entered against him on September, 2003, following a jury trial, on charges of intentional murder and criminal weapons-possession.

## II. Factual Background and Procedural History

Cooper was indicted with Terrance Washington ("Washington") on two counts of murder (intentional and depraved indifference) in connection with the shooting death of Kevin Hilliard ("Hilliard"). On the evening of January 31, 2003,[1] on Avenue D in the City of Rochester, Hilliard was seen arguing loudly with two men-one tall

---

[1] Cooper and Washington were jointly indicted in a second indictment charging them with three criminal-possession-of-a-weapon counts. Washington was tried separately and convicted.

and thin, and one heavy-set by area resident Lisandra Barbosa ("Barbosa"). Barbosa heard several shots and went outside where she saw Hilliard drop to the ground and the thin man and the heavy man get into a car and drive away. Barbosa explained that there was a lapse between the shots, but neither of the men returned to the car before the second shot was fired.

Officer Daniel Zimmerman, executing an unrelated search warrant at 9 Miller Street later that evening, saw Cooper (a heavy-set man) run into the basement. Cooper was apprehended hiding behind a hot-water heater with a .22 caliber bullet in his front pants-pocket.

Cooper was brought to the hospital for treatment of some cuts sustained on his hand. While there, Cooper signaled Officer Efrain Gonzalez to come over to him. Cooper told Officer Gonzalez that he did not want to go to jail, that he wanted to talk to the officer, that he had something very important to say about a shooting that had occurred earlier that night. At that point, Officer Gonzalez stopped Cooper because he was aware of the shooting and wanted another officer present.

Investigator Anthony Campione was summoned and, at Cooper's request, the men went outside the emergency room so Cooper could have a cigarette and talk to them. Cooper announced that before saying anything, he wanted a guarantee from the police that he would be released. Investigator Campione replied that he could not

do that since Cooper was under arrest on weapons-possession and drug charges based on what the police discovered at 9 Miller Street. Cooper, however, continued talking and said that he had been with "Jamal" (i.e., Jamal Williams) and "TT" who had been involved in the shooting. Cooper denied any involvement in the shooting but stated that the police could find another gun in the basement at 9 Miller Street. The police subsequently found a .32 caliber handgun with duct tape on it behind the hot-water heater in the basement at 9 Miller Street. A latent fingerprint on the duct tape matched Cooper's fingerprints.

After he was released from the hospital, Cooper was taken to the police station. Before talking to Cooper again, Investigator Campione issued <u>Miranda</u> warnings, which Cooper waived. Cooper then proceeded to give an oral statement to Investigator Campione. Cooper's last contact with Campione was 1:50 a.m. on the morning of February 1, 2003.

At 9:20 a.m., Officer Randall Benjamin had his first contact with Cooper and explained that they needed to interview some additional people before speaking with Cooper. Eventually, at 2:55 p.m., Officer Benjamin began reducing Cooper's statement to writing, although Cooper eventually refused to sign it.

At Cooper's trial, the prosecution's theory was that both Washington and Cooper injured Hilliard by shooting him in the knee with a .22 caliber handgun and in the head with a .32 caliber

handgun. According to the prosecution, the .32 caliber handgun found in Cooper's possession was taken from Hilliard before he was shot.

Laverne Lovett ("Lovett") testified that she was at 9 Miller Street with Cooper on the night of the search warrant's execution, and that she saw him with a gun covered with duct-tape. (As noted above, Hilliard was shot with a .32 caliber gun, and a .32 caliber gun with duct tape and a fingerprint matching Cooper's was found at the scene of his arrest.) Lovett also testified that Cooper had a long-handled brown gun. Lovett heard Cooper call Washington a "punk" for shooting someone in the leg on Avenue D and forcing Cooper to "take the nigger out." T.378.

Through Investigator Campione, the jury heard the substance of Cooper's statement at the hospital in which he admitted bringing bullets to Jamal Williams ("Williams") and being with Williams and Washington in a sport-utility vehicle ("SUV"). They stopped the car on Avenue D after Washington spotted Hilliard. T.465, 470-71. Cooper stated that Williams put on his (Cooper's) blue sweatshirt and got out of the vehicle with Washington. Cooper watched from the car as both men approached Hilliard carrying guns. T.471-72. Cooper told Investigator Campione that he heard some gunshots but did not see who fired them. T.472. The .22 caliber gun was tossed into the backseat where Cooper was sitting, and he tossed it into front

seat. T.472. Cooper insisted that he had no idea what Williams and Washington were going to do.

Cooper told a different story to Officer Benjamin at the police station, admitting that he knew Washington would use a gun to scare people with whom he had a problem. T.534. Later, Cooper changed his story to say that he had gotten out of the car, that he had seen Washington shoot Hilliard, and that Washington had come back to the car and asked Cooper to give him the .22 caliber revolver, which Cooper did. T.535. Cooper also admitted that during the shooting he was standing near Washington instead of standing near the SUV. Cooper told Officer Benjamin that he had seen Washington take a gun away from Hilliard (the victim) before the shooting and give it to him (Cooper). T.539. Cooper insisted that the .32 caliber revolver belonged to Washington, although he admitted handling it before the shooting. T.543.

Cooper testified in his own behalf and also called one witness, Jamal Williams. On the night of the shooting, Williams, Cooper, and Washington were driving around, getting high. Washington spotted Hilliard, Cooper with whom he had a "beef"; Cooper, however, testified that he had never seen Hilliard before. T.628.

Washington pulled over, and, taking the .32 caliber gun with him, walked up to Hilliard and began shoving him. When Hilliard reached into his pocket, Cooper got out of the car and approached

the two men. Cooper testified that he tried to calm Washington down, but Washington pushed Hilliard to the ground, reached into his pockets, pulled out a .38 caliber gun, and gave it to Cooper. T.635-36. Cooper then walked back to the truck with that gun, which he did not know whether or not it was loaded. T.645. He heard a shot but continued walking and got back into the SUV. T.636.

According to Cooper, Washington walked over and asked him for a "better gun", so Cooper handed him Williams' .22 caliber revolver. T.637-39. Washington left, and Cooper heard another shot. T.640. When Washington returned, Williams got into the driver's seat and they all drove away. Cooper insisted that he did not have possession of the .32 caliber gun that night. T.644.

The jury convicted Cooper of intentional murder and the two weapons-possession charges in the indictment, but acquitted him of depraved indifference murder. He was sentenced to an aggregate term of 25 years to life.

On direct appeal, the Appellate Division, Fourth Department, upheld the murder conviction and fourth degree weapons-possession conviction. Sua sponte examining the evidence supporting the conviction for third degree weapons-possession, the Fourth Department concluded it was legally insufficient because there was no evidence that the .38 caliber gun was operable. People v. Cooper, 59 A.D.3d 1052, 1053 (App. Div. 4th Dept. 2009). Although the prosecution was not required to prove that Cooper was aware of

its operability, it was required to prove that it was, in fact, operable. Id. Accordingly, the Fourth Department vacated that conviction. Id. Leave to appeal to the New York Court of Appeals was denied. People v. Cooper, 12 N.Y.3d 852 (N.Y. 2009).

This timely habeas petition followed. For the reasons set forth below, the petition is dismissed.

**III. Analysis of the Petition**

    **A.   Admission of Petitioner's Statements to Police in Violation of Fifth Amendment Privilege Against Self-Incrimination (Grounds One and Two of the Petition)**

Cooper contends that his statements to police officers at the hospital and at the police station were made in violation of his Fifth Amendment privilege against self-incrimination.

        **1.   Statements at the Hospital**

The Fourth Department held that the record established Cooper's statements made to Officer Gonzalez and Investigator Campione at the hospital "were spontaneous and were not the result of police interrogation[.]" People v. Cooper, 59 A.D.3d at 1054 (citations omitted). This holding did not incorrectly apply federal law.

The Supreme Court has held that spontaneous statements made to the police while the defendant is in custody need not be preceded by Miranda warnings unless there was "express questioning" by the police, or the conversation was "functionally equivalent" to an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In

Innis, a suspect volunteered to show police the location of a shotgun after hearing several officers discuss the possibility that children attending a nearby school for the handicapped might find the gun and accidentally injure themselves. The Supreme Court held that there was no "express questioning" and that the officers could not have known that the conversation was likely to trigger an incriminating response, since there was no suggestion that the officers were aware that Innis was "peculiarly susceptible" to such an appeal. 446 U.S. at 302. Accordingly, the Supreme Court concluded, the officers' conversation did not constitute interrogation and Innis's statements were admissible despite the absence of Miranda warnings.

The scenario in this case falls squarely within the ambit of Rhode Island v. Innis, supra. As noted above, Officer Gonzalez was in charge of guarding Cooper while Cooper was at the hospital receiving treatment for some minor injuries sustained during his arrest. Officer Gonzalez was not questioning Cooper; rather, Cooper, on his own initiative, summoned Officer Gonzalez to him and announced that he had important information about a shooting. Officer Gonzalez stated that he wanted another officer to hear what Cooper had to say, and requested that Investigator Campione join them. When Investigator Campione arrived, he did not question Cooper. Rather, Cooper volunteered that he had information which would be of interest to the police. The record more than adequately

supported the state courts' conclusion that Cooper's statements to Officer Gonzalez and Investigator Campione were volunteered and not the product of interrogation or its functional equivalent, and therefore were admissible at trial. See United States v. Guido, 704 F.2d 675, 677 (2d Cir. 1983) (applying Innis).

### 2.  Statements at the Police Station

Cooper also challenges his oral statements and unsigned written statement made to Officer Benjamin at the police station, after Cooper had waived his Miranda rights. Cooper does not dispute that he waived his rights, but rather contends that he was entitled to renewed Miranda warnings due to the passage of time between his waiver and his providing of a written statement.

The state courts were correct in determining that Cooper's waiver of his Miranda rights was not rendered invalid by virtue of the approximately 13 hours which elapsed between the waiver and his making the statements. People v. Cooper, 59 A.D.3d at 1054 ("'[W]here a person in police custody has been issued Miranda warnings and voluntarily and intelligently waives those rights, it is not necessary to repeat the warnings prior to subsequent questioning within a reasonable time thereafter, so long as the custody has remained continuous[.]'") (quotation and citation omitted). The New York rule is consistent with Supreme Court precedent.

As an initial matter, the Court notes that Petitioner has not cited and the Court has not found any Supreme Court case which requires renewed Miranda warnings for a defendant in continuous custody after a period of time has passed. Accord, e.g., James v. Ricks, No. 01 CV 4106 SJ, 2003 WL 21142989, at *7 (E.D.N.Y. Mar. 6, 2003). "In fact, a number of courts have held that mere passage of time does not require renewed warnings." Id. (citing United States v. Andaverde, 64 F.3d 1305, 1312 (9th Cir. 1995) (collecting cases which rejected the need for renewed Miranda warnings "simply because some time ha[d] elapsed")).

To the contrary, in Wyrick v. Fields, 459 U.S. 42 (1982) (per curiam), the Supreme Court stated that a court should look to the "totality of the circumstances" to determine whether renewed warnings are necessary. Id. at 47. Prior to undergoing a polygraph, the defendant in Fields had made a valid waiver of his Fifth Amendment right to have counsel present. Once the polygraph examination was over, the police continued to question Fields about the test results. Fields moved to suppress his post-test statements on the ground that he was entitled to renewed Miranda warnings. The Supreme Court disagreed, reasoning that Fields had "validly waived his right to have counsel present at 'post-test' questioning, unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing

and intelligent relinquishment or abandonment' of his rights." 459 U.S. at 47 (quoting Edwards v. Arizona, 451 U.S. 477, 482 (1981)).

Although the Fourth Department did not explicitly perform a "totality of the circumstances" balancing test as enunciated in Wyrick v. Fields, supra, its ultimate conclusion was not incorrect. As the Fourth Department found, the continuity of Cooper's police custody was undisputed. Moreover, the circumstances of his custody did not change between the time he waived his Miranda rights and the time he gave his statements so that it could be said he no longer was acting voluntarily and intelligently. Rather, during the approximately thirteen-hour interval, Cooper was allowed to speak with one of the codefendants, was provided with cigarettes and food, was allowed to use the bathroom, and he was permitted to telephone his mother. People v. Cooper, 53 A.D.3d at 1054.

As Cooper has failed to allege any material change in circumstances which would have required renewed Miranda warnings, his claim that the state court erred in admitting his statements made at the police station is denied. See James v. Ricks, 2003 WL 21142989, at *7 ("The record establishes that petitioner was given Miranda warnings at 9:20 a.m. on September 12, 1996, before any questioning occurred. Petitioner does not contest that he understood his rights and voluntarily decided to waive them to talk to the police. Over the next twelve hours, petitioner remained in the precinct house where he periodically spoke to Hall. Petitioner

does not allege that he was deprived of food, sleep or use of a bathroom during this period, nor is there any evidence to suggest that petitioner was subjected to intimidation or coercion. Petitioner confessed to the shooting at 10:20 p.m. after a one-hour conversation with Hall. Petitioner raises no facts that this last conversation with Hall was involuntary. In sum, there was no change in the circumstances of the interrogation alleged beyond the mere passage of time. The police were not required to renew petitioner's <u>Miranda</u> warnings solely because twelve hours had elapsed.").

> B. **Admission of Petitioner's Statements to Police in Violation of the Fifth Amendment Right to Have Counsel Present(Ground One of the Petition)**

Cooper mentions for the first time in his petition under Ground One that the statements to the police were take in violation of his Sixth Amendment right to counsel. However, no such claim was raised before the state courts, and thus it has not been properly exhausted. <u>See</u> 28 U.S.C. § 2254(b)(1); <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843–44 (1999) (state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process before filing a habeas petition).

The claim may be "deemed exhausted" because there exist no avenues in state court for Cooper to exhaust the claim. <u>Grey v. Hoke</u>, 933 F.2d 117, 120-21 (2d Cir. 1991). Cooper has already used the one direct appeal to which he is entitled. <u>See</u> N.Y. Court Rules

§ 500.20(a)(2) (applications to the Chief Judge for leave to appeal in a criminal case . . . shall indicate . . . (2) that no application for the same relief has been addressed to a justice of the Appellate Division, as only one application is available. . ."). If Cooper were to assert the claim in a collateral motion to vacate the judgment, it would be mandatorily dismissed because it was raised on direct appeal. See N.Y. Crim. Proc. Law § 440.10(2)(a) (stating that "the court must deny a motion to vacate a judgment when . . . (a) [t]he ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment . . ."). The state procedural rules which give rise to the constructive exhaustion of this claim also renders it procedurally defaulted. See, e.g., Ramirez v. Attorney Gen'l of N.Y., 280 F.3d 87, 94 (2d Cir. 2001) ("Even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.") (citing Grey, 933 F.2d at 120-21).

Petitioner's "forfeiture in state court" of the right-to-counsel claim "bars him from litigating the merits" of that claim "in federal habeas proceedings, absent a showing of cause for the procedural default and prejudice resulting therefrom." Grey, 933 F.2d at 121 (citing, inter alia, Murray v. Carrier, 477 U.S. 478, 492 (1986)). Petitioner makes no showing of cause or of prejudice

here. Therefore, the right-to-counsel claim asserted in Ground One of the petition must be dismissed without reaching the merits. Id.

### C. Erroneous Limitation on Cross-Examination (Ground Three of the Petition)

Cooper contends that trial counsel was deprived of a meaningful opportunity to cross-examine Lovett, who testified that she had seen Cooper on the night of the shooting in possession of a gun with duct tape wrapped around it. T.376. Lovett also claimed that Cooper had made a statement implying Washington had not fired the fatal shot. T.378.

Prior to cross-examining Lovett, trial counsel sought an adjournment to subpoena and review Lovett's mental health records, which was denied with leave to renew. T.373. During her cross-examination, Lovett stated that she was in a program for treatment of her "stress and depression[,]" explaining that she had these conditions as the result of losing one of her daughters. T.383-84. Trial counsel did not renew his request for Lovett's mental health records.

On direct appeal, appellate counsel argued that in order to properly assess Lovett's credibility, the jury "should have been made aware if Lovett had a history of paranoia, hallucinations or delusions." Petitioner's Appellate Brief at 25 (citing People v. Collins, 173 Misc.2d 350, 355-56 (N.Y. Sup. Ct. 1997) ("If a witness' mental condition could affect his/her ability to

-14-

accurately perceive and recall, evidence of such condition is relevant in a criminal prosecution. The jury which must evaluate the witness' testimony should certainly be made aware if a witness has a history of paranoia, hallucinations or delusions.") (citing People v. Rensing, 14 N.Y.2d 210, 215 (N.Y. 1964) ("[I]t had been brought home to the jurors that the witness in question 'had blown "his top"', had attempted to commit suicide by butting his head against the iron bars of the cell in which he was detained and had previously been confined in a mental hospital. The jurors were, therefore, aware that the witness may not have been 'normal' and, in consequence, their assessment of his testimony was not made, as it was in the present case, without knowledge that he was, and long had been, mentally ill.").

The Fourth Department summarily dismissed this claim as "lacking in merit." People v. Cooper, 53 A.D.3d at 1054. As an initial matter, it is questionable whether the claim was "fairly presented" in federal constitutional terms for exhaustion purposes. Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984). However, Respondent has not raised the defense of non-exhaustion and has addressed the claim on the merits. The Court therefore proceeds to examine the merits of the argument.

Reading Cooper's pro se petition liberally, the Court construes the allegations as asserting a violation of the Sixth

Amendment's right of confrontation, which provides the accused the right to cross-examine witnesses and to "test[ ] the recollection and sift[ ] the conscience of the witness." Mattox v. United States, 156 U.S. 237, 242 (1895); accord California v. Green, 399 U.S. 149, 158 (1970). However, "trial judges retain wide latitude, insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). "All erroneous rulings that improperly restrict cross-examination under state or federal rules of evidence do not necessarily implicate the Confrontation Clause." Harper v. Kelly, 916 F.2d 54, 57 (2d Cir.1990). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility." United States v. Roldan-Zapata, 916 F.2d 795, 806 (2d Cir. 1990) (internal quotation marks omitted), cert. denied, 499 U.S. 940 (1991).

Cooper's right-of-confrontation claim is deficient for several reasons. First, there is no basis in the record for inferring that Lovett indeed suffered from a "history of paranoia, hallucinations or delusions" as appellate counsel suggested in his appellate brief. The reference to "paranoia, hallucinations or delusions" was quoted from a decision in which the complaining witness had an extensive history of psychiatric illness and her mental health records showed that she had been an in-patient at a psychiatric

hospital, had stabbed a classmate, suffered from bouts of paranoia, and was chronically delusional, attributing hostility to others. People v. Collins, 173 Misc.2d at 352.[2]  Here, there was not a scintilla of evidence that the witness at issue, Lovett, had suffered at any time from paranoia, hallucinations or delusions as had the complainant in Collins. Thus, appellate counsel's quotation of Collins was misleading in the context of this case.

Moreover, although the trial court denied trial counsel's initial application for Lovett's psychiatric records made prior to cross-examination, the denial was with leave to renew. Thus, if counsel had unearthed information during questioning of Lovett that would have warranted subpoenaing her mental health records, trial counsel could have renewed his application. However, he did not do so as his cross-examination revealed merely that Lovett had sought out-patient care from a mental health clinic for ordinary stress and depression resulting from her having lost one of her daughters. This condition did not make her incompetent to testify or render her testimony unworthy of belief. See Garcia v. Dufrain, Nos. 98-CV-1692 (JBW), 03-MISC-0066, 2003 WL 21813218, at *11 (E.D.N.Y. July 29, 2003) ("[E]ven if the victim did suffer from some unidentified psychiatric problem, this would not render her

---

[2] Collins involved an alleged violation of Brady v. Maryland, 373 U.S. 83 (1963). The prosecution in Collins had refused to disclose the complainant's mental health records, arguing that they had no obligation to do so under Brady, but the court agreed with the defendant that the prosecution's failure to make inquiry of the complainant ran afoul of due process. Id. at 353-54.

incompetent to testify. . . .[H]er testimony, both on direct and cross-examination, confirms that she was competent.").

Furthermore, the prosecution did not interpose any objections to trial counsel's questioning of Lovett about her mental health treatment and thus Cooper has not demonstrated that trial counsel's cross-examination was restricted. See Garcia v. Dufrain, 2003 WL 21813218, at *11 ("The record shows that the victim was fully cross-examined and every possible error in her testimony was fully explored. Unless the alleged psychiatric condition concerned hallucinations, or a false report of sexual attacks they would have been irrelevant and excluded from the case. Finally, absent compelling evidence supplied by petitioner, or problems made obvious through the victim's testimony, there was no basis to compel an examination outside of court of the victim.").

Cooper has failed to demonstrate that Lovett suffered from a psychiatric or other condition which impaired her ability to accurately remember what she observed and to testify truthfully about it. As there is no basis for concluding that Cooper's counsel was denied a full and fair opportunity to cross-examine Lovett, and this claim does not warrant habeas relief.

## IV. Conclusion

For the reasons stated above, Jessie J. Cooper's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition (Docket No. 1) is dismissed. Because Cooper has failed

to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability as to any of the issues asserted in the petition. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

DATED:   November 17, 2011
         Rochester, New York